IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CURTIS JAMES WILLIAMS, JR.          §
                                    §
            Plaintiff,              §          Case No.: 4:12-cv-01807
                                    §
v.                                  §
                                    §
CAROLYN W. COLVIN[1]                §
Acting Commissioner of Social Security, §
                                    §
            Defendant.              §

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this social security appeal is Plaintiff's Motion for

Summary Judgment and Brief (Document Nos. 12 & 13) and Defendant's Cross Motion for

Summary Judgment and Memorandum in Support (Document No. 14). After considering the

motions for summary judgment, the administrative record, and the applicable law, the Court[2]

ORDERS, for the reasons set forth below, that Defendant's Cross Motion for Summary

Judgment is GRANTED, that Plaintiff's Motion for Summary Judgment is DENIED, and the

decision of the Commissioner of the Social Security Administration is AFFIRMED.

## I.      Introduction

Plaintiff Curtis Williams, Jr. ("Williams") brings this action pursuant to Section 205(g) of

the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she therefore should be substituted for Michael J. Astrue as the defendant in this case.
[2] On June 19, 2012, pursuant to the parties' consent, this case was referred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 9.

the Commissioner of the Social Security Administration ("Commissioner") denying his request for supplemental security income ("SSI") benefits. Williams contends: that the Administrative Law Judge ("ALJ") and Appeals Council failed to properly consider the severity of Williams' mental impairments; the ALJ erred in finding that Williams does not need to elevate his left leg; and the ALJ erred by relying on the medical-vocational guidelines. In contrast, the Commissioner contends that there is substantial evidence to support the ALJ's decision that Williams was not disabled, and the decision comports with applicable law and therefore should be affirmed.

## II.   Administrative Proceedings

Williams applied for SSI benefits on October 9, 2009, claiming that he had been unable to work since January 12, 2009, as a result of constant leg pain after surgery to repair a broken leg and ankle following a slip-and-fall. (Tr. 75-77)[3]. The Social Security Administration denied the application at the initial and reconsideration stages. (Tr. 80-90). Williams then requested a hearing before an ALJ. The Social Security Administration granted his request and the ALJ, Janis Estrada, held a hearing on September 30, 2010, at which Williams' claims were considered *de novo*. (Tr. 13). On January 7, 2011, the ALJ issued a decision finding Williams not disabled. (Tr. 13-24).

Williams sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's

---

[3] "Tr." Refers to the transcript of the administrative record.

actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering Williams' contentions in light of the applicable regulations and evidence, the Appeals Council denied Williams' request for review on April 17, 2012. (Tr. 1-3). Thus, the ALJ's findings and decision became final.

Williams filed a timely appeal of the ALJ's decision. Plaintiff filed a Motion for Summary Judgment and Brief on February 14, 2013. (Document Nos. 12 & 13). The Commissioner responded by filing a Cross Motion for Summary Judgment and Memorandum in Support on March 15, 2013. (Document No 14). This appeal is now ripe for ruling.

The evidence is set forth in the record, pages 1-691. There is no dispute as to the facts contained therein.

## III.   Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the

record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)).

## IV.   Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical

and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42. U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, [he] will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents [him] from doing any other substantial gainful activity, taking into consideration [his] age, education, past work experience and residual functional capacity ("RFC"), [he] will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner shows that

other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ determined, in her January 7, 2011 decision, that Williams was not disabled. In particular, the ALJ determined that Williams was not presently working (step one); that Williams' combination of status post fall with fracture of left tibia, degenerative joint disease, and hypertension were severe impairments but that his mental impairment was not severe (step two); that Williams' status post fall with fracture of left tibia, degenerative joint disease, and hypertension did not meet or equal an impairment listed in Appendix 1 of the Regulations (step three); that Williams was not capable of performing his past work (step four); and that Williams had the residual functional capacity to perform a full range of sedentary work[4], taking into consideration Williams' age, education, past work experience, and residual functional capacity, and applying the Medical-Vocational Guidelines, determined he was not disabled (step five). (Tr. 18-23). In this appeal, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the Court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of facts; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

---

[4] Sedentary work is defined as follows: [I]nvolves lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking around and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. 416.967(b).

## V.   Discussion

### 1.   Objective Medical Facts

The objective medical evidence shows that Williams has been treated for status post fall with fracture of left tibia, degenerative joint disease, hypertension, and depression.

### A.   Status Post Fall with Fracture of Left Tibia

On January 12, 2009, Williams was admitted to Ben Taub General Hospital for a left tibia fracture. (Tr. 235). Two days later, on January 14, Williams underwent surgery to repair the fracture with a rod and screws. (Tr. 238). During the operation, it was noted that the fracture had lacerated his anterior tibial artery, which was also repaired. (Tr. 238). Williams was released on January 16, 2009. (Tr. 235). He returned to the hospital on January 30, 2009, February 11, 2009, and April 30, 2009 to check on his fracture's healing. (Tr. 354-55, 352-53, 351). The medical records from each examination state that x-rays showed the fracture fragments were in adequate position and alignment; that the fracture was in the process of healing; and that there were no signs of hardware loosening or failing. (Tr. 351-55).

On July 27, 2009, Williams went to the hospital complaining of pain in his leg. (Tr. 349-50). X-rays were taken, which showed healing of the fracture and no hardware loosening. (Tr. 350). Additionally, the medical record noted that there was extensive ankle swelling and extensive disuse osteopenia. (Tr. 350). Williams was prescribed hydrocodone for his pain. (Tr. 267-68). Williams returned to the hospital on August 17, 2009, complaining of swelling in his left leg. (Tr. 242-44). A Doppler scan was performed. There was no evidence of deep venous thrombosis. (Tr. 242). Also, x-rays taken of Williams' left knee, tibia, and ankle showed no signs of hardware failure or loosening. (Tr. 244). Williams returned to the hospital again on September

7

25, 2009 complaining of left leg pain. (Tr. 240). X-rays were taken of Williams' left tibia. The x-ray showed no evidence of hardware loosening or failure. The treatment note reveals that Williams' leg was in the late stages of healing, and while there was persistent soft tissue swelling, the swelling decreased from his August 17, 2009 admission. (Tr. 240).

On March 22, 2010, Williams went to the hospital for leg pain and numbness in the toes of his left foot. (Tr. 509). He reported that he had not experienced relief in his pain from gabapentin and naproxen, his other prescriptions for pain. (Tr. 510). Because Williams complained he was still having pain despite his medication, he was referred to physical therapy and pain management. Williams was prescribed a new medication for his pain, Tramadol. (Tr. 511). While records state Williams was referred to pain management, there are no records that show he ever met with a pain management specialist. On April 13, 2010, he returned to the hospital for a follow up appointment. (Tr. 272). He had mild swelling in his left ankle and decreased range of motion. (Tr. 277).

On March 29, 2010, Williams began physical therapy with Annette Karim ("Karim"), a physical therapist. (Tr. 282). Karim noted that Williams had decreased sensation along his anterior tibia and between his first and second toes and had limitation of movement in his ankle eversion. (Tr. 284). Williams was given a series of seven exercises. (Tr. 284). Her notes from all subsequent sessions noted the same decreased sensations and limitation of movement. (Tr. 280, 408, 405, 518, 516, & 547).

On April 7, 2010, Williams had his second physical therapy session. Karim's assessment of the session stated that Williams was able to do the exercises and successfully demonstrated continual movement by doing more repetitions than asked for; however, she also noted that Williams did less and complained more when he was given attention. (Tr. 281). Additionally, the

record states Williams was able to demonstrate his current home exercise program independently. (Tr. 281).

On May 17, 2010, Williams had his third physical therapy session. Karim's assessment of the session stated that Williams successfully completed his exercises in a group setting, and she again noted his willingness increased with encouragement. (Tr. 408).

On May 25, 2010, Williams had his fourth physical therapy session. (Tr. 404). Karim's assessment shows that Williams' passive range of motion in his knee flexion increased; however, though Williams claimed to be experiencing pain, he appeared to be pain free. (Tr. 406). She also noted Williams was also unable to lift the same weight he had the week before in his previous session. (Tr. 406).

On June 8, 2010, Williams had his fifth physical therapy session. (Tr. 518). Karim again noted that Williams' gait did not demonstrate any appearance of pain, yet he still complained of pain and stated his pain did not change after the session. (Tr. 518-19).

On June 22, 2010, Williams had his sixth physical therapy session. (Tr. 515). Prior to beginning the session, Williams stated he had twisted his ankle the day before. (Tr. 516). Karim noted Williams' left distal tibia was warm but not tender to touch, and there was some tenderness with pressure. (Tr. 516). Because Williams was afraid to exercise, they focused on core exercises. (Tr. 516). Karim again noted that Williams' gait did not demonstrate any appearance of pain, though he continued to complain of pain after the session. (Tr. 516).

Williams' seventh physical therapy session was on June 28, 2010, with Brian Duncan, another physical therapist. (Tr. 514). Duncan's assessment noted Williams had functional range of motion in his ankle. (Tr. 514). Duncan further noted that it did not appear to him that Williams wanted to get better based on his behavior and questionable work ethic. (Tr. 514). Duncan

concluded the report by outlining a plan to follow up with Williams for another week or two but intended to discharge him if he did not demonstrate a change in behavior or exercise intensity. (Tr. 514).

On July 27, 2010, Williams met with Karim for the last time. Though Williams continued to complain of pain in his leg, she noted his left distal tibia was tender neither to touch nor with pressure, and he did not appear to be in any pain. (Tr. 547). She further noted Williams was unwilling to go to a gym near his home but reported he was exercising with his home exercise program. (Tr. 547). She concluded that Williams no longer needed physical therapy. Williams had completed all physical therapy goals[5] and still complained of pain. (Tr. 547).

### B.  Degenerative Joint Disease of the Knee

On August 17, 2009, Williams went to the hospital complaining of swelling and pain in his leg. (Tr. 243). X-rays were taken of his left leg and both knees. (Tr. 244). The knee x-rays showed degenerative changes in Williams' knee, including spurring of the tibial spines. (Tr. 244).

Karim's notes from Williams' sessions stated he was able to perform knee flexion from the very first session and continued to perform throughout their sessions together. (Tr. 528, 526, 523, 521, 518, 516). Karim noted Williams demonstrated knee flexion within normal limits at his final exam. (Tr. 516).

---

[5] Williams' physical therapy goals were: (1) to be able to properly demonstrate his home exercise program independently; (2) to increase his passive range of motion to within normal limits to allow for normalized gait mechanics; (3) to increase the strength of his left leg to return to prior functional status; (4) to decrease paint to 2/10 with functional activities; and (5) to walk 150 feet without any assistive device, independently without deviation, and be pain free. (Tr. 284).

### C.     Hypertension

On July 27, 2009, Williams was prescribed amlodipine, for high blood pressure. (Tr. 268). His medications were routinely filled. (Tr. 509, 511). On April 20, 2010, Williams went to the hospital for a nurse visit to have his blood pressure checked. (Tr. 445-46). Williams returned on May 7, 2010 for a follow up appointment. The record from this visit noted that Williams reported that he was compliant with his daily medicine but not with his diet or exercise. (Tr. 442). Williams was prescribed lisinporil, and the nurse instructed him to follow a diet and perform exercise daily. (Tr. 443-44). He returned to the hospital again on June 3, 2010, for another follow up appointment. Williams was instructed to continue taking lisinopril and amlodipine. (Tr. 430). On July 6, 2010, Williams had another follow up appointment for his blood pressure and cholesterol. He reported he had not taken his blood pressure medication that day. (Tr. 455). His physical exam was normal, and he was prescribed a different medication for his hypertension. (Tr. 456 & 458). On July 30, 2010, Williams again returned to the hospital to have his hypertension checked. The record shows that Williams was mostly adherent with his medication, and he currently met his blood pressure goal for the visit. (Tr. 541).

### D.     Depression

On March 22, 2010, Williams went to the hospital complaining of pain in his leg and numbness in the toes of his left foot. (Tr. 509). During the examination, Williams told the physician he had been feeling depressed for six months and had a history of anxiety. (Tr. 510). Prior to this visit, he had not reported any feelings of depression or anxiety. Due to this, he was referred to the hospital's psychiatry department. (Tr. 511).

Williams met with Sarah Ramos, M.D. for the first time on June 4, 2010. (Tr. 460). Following the appointment, Dr. Ramos noted: Williams was cooperative and forthcoming though

he had poor eye contact; his mood was down; he did not demonstrate clear psychotic symptoms; he had passive thoughts of death; he had fair to poor insight, fair to poor judgment, and good impulse control. (Tr. 579). She rated Williams' global assessment of functioning ("GAF") at 50[6]. (Tr. 579). Dr. Ramos diagnosed Williams with depression NOS, anxiety NOS, ethanol abuse, and a history of THC abuse, referred him for therapy, and prescribed him citalopram.[7] (Tr. 577 & 579).

Williams met with Sharlie Velasco at LCSW on July 9, 2010 for his first counseling session. During their session, Velasco gave him a handout on schizoaffective disorder. Based on

---

[6] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social, and occupational functioning." *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001) (citing Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM-V) at 32). The score is often given as a range and is no longer included in the DSM-V. A GAF range of 41-50 suggests "serious symptoms. (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, of school functioning (e.g., no friends, unable to keep a job, cannot work)." Here, Williams GAF scores were not accompanied by any findings as to any social or occupational limitations identified by Dr. Ramos in her two sessions with Williams.

[7] The results of the mental status exam follow.
Appearance: well groomed, casually dressed, overweight
Psychomotor activity: no retardation, no agitation
Abnormal movements: none
Attitude: cooperative, forthcoming, poor eye contact
Affect: constricted, mildly dysphoric
Mood: "down"
Speech: normal rate, rhythm, and volume
Thought processing: linear
Thought content/perceptions: no clear psychotic sxs. Sometime hears voice calling his name. No other a/t. No v/t. No delusions.
Suicidal ideation: passive thoughts of death. Denies suicidal plan or intent.
Homicidal ideation: stated none
Cognition: intact
Insight: fair to poor
Judgment: fair to poor
Impulse control: good

their session and mental status exam[8], Velasco assessed Williams as having schizoaffective disorder, depressive type and, like Ramos, rated him at a GAF of 50. (Tr. 563 & 565).

On July 20, 2010, Williams had his second appointment with Dr. Ramos for 20 minutes. Williams gave Dr. Ramos the handout on schizoaffective disorder he had been given by his therapist. During the session, he reported he heard voices and saw images. However, it was difficult to get a clear history of his hallucinations because he was very evasive and could not describe what he heard or saw. (Tr. 558). She again noted Williams had passive thoughts of death, a down mood, fair to poor insight, fair to poor judgment, and good impulse control. (Tr. 559). She again rated him at a GAF of 50. (Tr. 559). She added Abilify to his medications. (Tr. 559). After this session, Dr. Ramos upgraded her diagnosis to major depressive disorder with psychosis, anxiety NOS, and alcohol abuse. (Tr. 559).

On July 23, 2010, Williams met with Velasco for a follow-up appointment. She again noted he was agitated, tearful, depressed, highly anxious, and paranoid. (Tr. 553). She rated him at a GAF of 50 again. (Tr. 553). Williams met with her again on August 6, 2010 where she noted the same things and gave the same GAF rating as their previous session. (Tr. 535-36). She maintained her diagnosis of schizoaffective disorder, depressive type following both sessions. (Tr. 553 & 536).

---

[8] The results of the mental exam follow.
Oriented: X3
General: Casually groomed, cooperative
Attitude: cooperative, forthcoming, poor eye contact
Affect: Agitated, tearful
Mood: Depressed, highly anxious
Thought processing: Linear, logical
Thought content + Perception: Denies SI/HI; endorses AVH and paranoia
Cognition: alert, intact

On October 5, 2010, Dr. Ramos filled out a Psychiatric/Psychological Impairment Questionnaire regarding Williams. Although the Questionnaire identifies August 31, 2010, as the most recent exam, there is no such record of that exam in the records. With respect to Williams' prognosis, Dr. Ramos wrote: "Prognosis is guarded. Mr. Williams has poor social support and many chronic social stressors." (Tr. 661). In it, she rated his current GAF as 50 and noted that his lowest in the past year is unknown. (Tr. 661). She also noted his primary symptoms were depressed mood with chronic intermittent suicidal thoughts as well as irritability and poor frustration tolerance. (Tr. 663). Dr. Ramos placed check marks next to the clinical findings that supported her diagnosis. The boxes checked were appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional liability, delusions or hallucinations, paranoia or inappropriate suspiciousness, suicidal ideation or attempts, perceptual disturbances, social withdrawal or isolation, decreased energy, and hostility and irritability. (Tr. 662). Dr. Ramos identified Williams' primary symptoms as being "depressed mood with chronic, intermittent, suicidal thoughts. He has a lot of irritability and poor frustration tolerance." (Tr. 663). The Questionnaire further rated the patient's mental abilities in four areas: understanding and memory, sustained concentration and persistence, social interactions and adaption. With respect to Understanding and Memory, Williams was rated as "markedly limited" in the ability to understand and remember detailed instructions. He was "mildly limited" in the ability to remember locations and work-like procedures, and the ability to understand and remember one or two-step instructions. (Tr. 664).

As to Sustained Concentration and Persistence, Williams was "markedly limited" in all areas but two. Those areas are the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for

extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; the ability to sustain ordinary routine without supervision; and the ability to work in coordination with or proximity to others without being distracted by them; and the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 664-65). The area identified as "moderately limited" was the ability to make simple work related decisions, and Williams was rated as "mildly limited" in the ability to carry out simple one or two-step instructions. (Tr. 664-65).

The next area, Social Interactions, shows Williams was "markedly limited" in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. In the other areas, the ability to ask simple questions or request for assistance and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, he was "moderately limited". (Tr. 665).

As to Adaptation, Williams was "moderately limited" in one area: the ability to travel to unfamiliar places or use public transportation. In all other areas rated, Williams was rated as "markedly limited". The areas identified as "markedly limited" were: the ability to set realistic goals or make plans independently, the ability to be aware of normal hazards and the appropriate precautions, and the ability to respond appropriately to changes in the work setting. In sum, Dr. Ramos identified Williams as "markedly limited" in most areas. (Tr. 665-66).

The record further shows that Dr. Ramos completed another Impairment Questionnaire on February 22, 2011. (Tr. 670-77). Although Dr. Ramos indicates she last examined Williams

on October 26, 2010, there are no records from this examination, as was the case with the earlier Questionnaire. This Questionnaire was based on an examination two months later. Again, Dr. Ramos checked boxes that supported her diagnosis. This time, Dr. Ramos identified substance dependence, generalized persistent anxiety, and difficulty thinking or concentration as new findings supporting her diagnosis. (Tr. 671). Omitted were appetite disturbance, personality change, emotional liability, perceptual disturbances, and social withdrawal or isolation. Identified as the most frequent and/or severe of Williams' clinical findings/symptoms were irritable mood, poor sleep, and energy. (Tr. 672). The Questionnaire responses are primarily the same except for the following changes. In the area of Understanding and Memory, Williams had previously been rated as "mildly limited" in the ability to remember locations and work-like procedures and ability to understand and remember one or two-step instructions. This was changed to "moderately limited". Likewise, with respect to Sustained Concentration and Persistence, Williams' rating for the ability to carry out simple one or two-step instructions was also "moderately limited". The first two areas related to social interactions and addressed the ability to interact appropriately with the general public, and in the area of adaptation, in his ability to be aware of normal hazards and take appropriate precautions, and the ability to set realistic goals or make plans independently. (Tr. 673-74). In response to a question asking when Williams first experienced symptoms and limitations described in the Questionnaire, Dr. Ramos wrote, "I started seeing patient June 2010. I cannot commit prior to June 2010." (Tr. 677).

Here, substantial evidence supports the ALJ's finding that Williams' hypertension, status post fall with fracture of left tibia, and degenerative joint disease were severe impairments at step two and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment and that he had the RFC to perform sedentary work. The ALJ

16

incorporated all of the medical opinions in determining Williams' RFC for sedentary work. In particular, the ALJ found that Williams' hypertension was well controlled and as to his status post fall with fracture of left tibia and degenerative joint disease, that the x-rays showed the fracture healed and that there was no hardware loosening. Further, Doppler scans showed no evidence of deep venous thrombosis. In addition, substantial evidence supports the ALJ's finding that Williams' allegation of a mental impairment did not meet the duration requirement and was not a severe impairment. The "duration requirement" refers to the requirement that a claimant's impairment "must have lasted or be expected to last for a continuous period of at least 12 months." See 20 C.F.R. 416.905(a), 416.909, 416.920(a)(4)(ii). Here, Williams did not allege mental health related symptoms on his initial application, on his request for consideration, in his functional report, and any mention of mental health difficulties was conspicuously absent in the medical records until he complained of anxiety in March 2010. (Tr. 510). He also did not start receiving mental health treatment until June 2010. Moreover, Williams' treating psychiatrist, Dr. Ramos, declined to make a retrospective diagnosis and specifically stated she could not state that Williams had clinical symptoms or functional limitations prior to when she started seeing him in June 2010. The medical records from June 4, 2010 and July 20, 2010 from Dr. Ramos and the counseling sessions with Velasco on July 9, 2010, July 23, 2010, and August 6, 2010, do not reflect a mental impairment continuing over a 12 month period, from the onset date of October 5, 2009 through the date of the ALJ's decision on January 7, 2011. Moreover, substantial evidence supports the ALJ's determination that Williams' depressive symptoms showed no more than "mild" limitation in the functional activities of daily living, social functioning, concentration, and persistent pain, and there were no episodes of decompensation. This factor weighs in favor of the ALJ's decision.

### 2.    Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinion and diagnoses and medical sources, "'the ALJ has the sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)    the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton*, 209 F.3d at 456. While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference. *Id.* Again, the Social Security Regulations provide guidance on this point. Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 . . . providing appropriate explanations for accepting or rejecting such opinions." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton*, 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." Id. at 455; *see*

*also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given the opinions of the medical sources.

On October 8, 2009, Dr. Schiesser completed a two-page interrogatory on Williams. While her report stated that Williams needed to elevate his left leg at waist level while sitting for seven hours, it only consisted of five questions and did not require any explanation by the physician. (Tr. 253-54).

On November 9, 2009, Williams met with Dr. Portnoy for a disability determination examination. Dr. Portnoy noted Williams' left ankle was swollen but not pitting, was tender upon examination, and movement was mildly limited but there was not any heat, redness, or fluctuance. (Tr. 257). He also noted that Williams' gait was difficult to evaluate, because Williams exaggerated it by putting more weight on his right leg than his left, and questioned whether or not his hypertension was under control. (Tr. 257). Dr. Portnoy's impressions from the exam state it was unclear what caused Williams' pain and that there was no explanation for it based on the data he had or on the exam. (Tr. 257).

Dr. Cremona completed a RFC assessment on November 20, 2009 following his review of Williams' medical records. Dr. Cremona concluded that Williams could lift and/or carry ten pounds occasionally and slightly less than ten pounds frequently, could stand and/or walk at least

two hours but was limited to four or five hours and could sit about six hours during an eight hour work day, and was limited in his lower extremities. (Tr. 259). He further noted Williams could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally but could never climb a ladder, rope, or scaffolds. (Tr. 260).

The ALJ, finding Dr. Schiesser's interrogatory to be dated and not supported by the medical evidence, based her decision on substantial objective medical evidence found in the record. In doing so, the ALJ thoroughly discussed and compared the objective medical evidence with Dr. Schiesser's opinion:

> The opinion evidence includes an October 2009 document from Rachel Schiessen [sic], who did not designate her function, title or responsibilities at Ben Taub Pediatrics, in which she offered the opinion that the claimant required that his leg be raised to waist height 7 of 8 hours a day (Exhibit B-2F). As the claimant was treated at Ben Taub Pediatrics only in January 2009, with follow-up to the HCHD Orthopedic and Physical Therapy Clinics, any option from this source is aged and does not contain recent assessments of the claimant's functioning. Moreover, it is not clear what kind of treating source is offering the opinion, what the treating relationship is with regard to the claimant, or the duration of such a relationship. Because there are no treating notes from this source, there is no basis with which to conjure the opinion to the claimant's medical records, which show a well-healed fracture with normal alignment. The treatment notes also reveal a claimant in no apparent distress showing no warmth or redness at the fracture sight despite a limited range of motion due to degenerative joint disease. The claimant's physical therapy notes show that the claimant has met the goals of ambulating 150 feet without pain, and the left leg shows only mild edema (Exhibits B3-F; B-7F/9; B-10/F2). The undersigned finds that Ms. Schiessen's [sic] opinion is not supported by medical evidence and is not consistent with the record as a whole, and gives it no weight.

(Tr. 22). Williams contends that the ALJ's decision that he does not need to elevate his left leg is not supported by substantial evidence and instead gives significant weight to the opinion of a non-examining State agency medical consultant. However, as the ALJ's decision stated and the record shows, the ALJ did not simply base her decision on a non-examining consultant's opinion but also on the great weight provided in the objective medical evidence. This evidence was

supported by clinical findings compared to Dr. Schiesser's opinion. Given the thoroughness of the ALJ's discussion of the objective medical evidence and comparison to Dr. Schiesser's opinion, the ALJ's finding that Williams does not need to elevate his leg is supported by substantial evidence. The Court concludes that the diagnosis and expert opinions factor also supports the ALJ's decision. The ALJ's decision is a fair summary and characterization of the medical records.

### 3.    Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of physical or mental impairment, which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the Social Security Act only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914, F.2d at 618-19 (citing *Harrell v. Bown*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment, which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective

symptoms is a task particularly within the province of the ALJ, who has the opportunity to observer the complaint. *Hames*, 707 F.2d at 166.

Throughout Williams' physical therapy sessions, he consistently complained of experiencing pain rated at 8/10 with his medication and that it hurt him all the time. (Tr. 280, 284, 405, 407, 516, 518, & 547). At the hearing, Williams testified that his leg often swelled because of moving around on it, and he had to elevate it for a few hours in order to reduce the swelling. (Tr. 48-49). During his testimony, he stated that his medication did eliminate his pain from time to time and that there were not times when it did not eliminate his pain, which contradicts his statements to his physical therapist. (Tr. 51). Additionally, he testified that he could climb a flight of stairs on his best days and bad days, though he must go up them slower than other people and use a cane and handrail for assistance. (Tr. 51-53). He also testified that he continued to do the home exercise routine that his physical therapist taught him. (Tr. 62).

The ALJ found Williams' complaints of pain not credible. In doing so, the ALJ wrote:

> At the hearing, the claimant testified that he has days that he is "ok" and days when he almost collapses. He described constant numbness in the big toe of his right foot, and the intermittent swelling of this leg that requires elevation at waist level 2 to 3 times a week. He explained that the swelling requires "a couple of" hours. He stated that on his best days he can walk across the street and climb a flight of stairs. He remains in the recliner on bad days. He estimated that he can sit 30 minutes before his legs get numb.
>
> * * *
>
> After careful consideration of the evidence, the undersigned finds that the claimant's hypertension, residual effects of his fall and fracture, and degenerative joint disease in the left tibia/fibula area could reasonably be expected to cause some discomfort; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> After his surgery, the claimant returned to the HCHD Orthopedic Clinic for follow-up x-ray examinations in August 2009. These showed well-maintained joint spaces and no evidence of hardware failure or loosening (Exhibit B-1F/14).

At the September 2009 follow-up, the claimant was observed to ambulate "ok." His incisions were fully healed, as was his tibial fracture. He was discharged from the Clinic with no prescription for an assistive device, no instructions to elevate his leg, and no complaints of excessive pain. In fact, the HCHD records contain no reference to assistive devices or leg elevation through the 2010 treatment notes and physical therapy notes (Exhibit B-1F/19; B-10F; B-12F).

In November 2009, Dr. Benjamin Portnoy, M.D., examined the claimant without finding any cause for his ongoing pain. He observed normal pulses, no redness or warmth, and in general made no abnormal findings, other than when he attempted to assess the claimant's gait. He reported that the claimant's exaggerated effort to place weight on the right leg compromised a proper assessment of his gait (Exhibit B-3F).

The physical therapy examinations show some reduced range of motion and sensory deficits at the front of the left lower extremity down to between the 1st and 2nd toes. April 2010 notes show that the lower extremity swelling was mild (Exhibit B-7F/9, 16). Despite these minimal manifestations, [sic] the claimant regularly told his therapists that he experiences pain at a level 8 on a scale of 1 to 10. This level of pain was not observed by the therapists, and they considered him fully capable of meeting his treatment goals, but they observed poor motivation and behavior that did not show a desire to get well (Exhibit B-12F).

(Tr. 20-21). Credibility determinations, such as those made by the ALJ in this case in connection with Williams' subjective complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995). Because the ALJ supported his credibility determination with references to the medical evidence and Williams' testimony about his daily activities, and because the ALJ did not rely on any improper factors, the subjective evidence factor also weighs in favor of the ALJ's decision.

**4.     Education, Work History, and Age**

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or

24

mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

At the time of the administrative hearing on September 30, 2010, Williams was 41 years old, had an eighth grade limited education, and had past relevant work as a commercial truck driver and mover. After having determined that Williams could engage in the full range of sedentary work, the ALJ questioned a vocational expert regarding jobs that Williams could perform. In questioning the vocational expert, the ALJ posed the following hypothetical:

> Q: Please assume the following hypothetical individual who has the same vocational profile as the claimant, and is a younger individual with a limited education and past relevant work as [a mover, a job that is very heavy in exertional level and unskilled]. And further assume that such an individual is status post-fall on January 9, 2009, with left tibia fracture, and that also has a interior tibia artery laceration, left knee degenerative joint disease, hypertension, and

> * * *

> Q: Okay, and also, an affective disorder, anxiety NOS, and alcohol abuse. And such a hypothetical individual's condition is associated with chronic mild to moderate pain and swelling for the left lower extremity. And as a result, such a hypothetical individual is limited to lifting occasionally 10 pounds; frequently less than 10 pounds, slightly less than 10 pounds frequently. Such as a hypothetical individual is able to be on his feet, standing or walking, with the usual morning and afternoon breaks and lunch period for at least two hours in an eight-hour workday, within 12 months; able to stand and walk four to five hours. Such an individual would be able to sit for six of eight hours in a typical work setting, again, with the usual morning and afternoon breaks and lunch hour. Pushing and pulling would be limited to the 10 pounds maximum. Such individual could occasionally climb stairs and ramp, but could never engage in any ladder, roping, or scaffolding activities; could occasionally balance, stoop, kneel, crouch, and crawl. Further, such individual would be limited to simple repetitive tasks. And would not have any other restrictions. Do you have an opinion regarding whether there would be any jobs available for such a hypothetical individual in a competitive work setting?

> * * *

A: He would, I think, under the circumstances, would be able to do some sedentary jobs, your honor.

(Tr. 66-68).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert, which incorporated all of the impairments the ALJ found supported by the record. In response to the hypothetical, the vocational expert identified jobs existing in significant numbers in the local and national economy that Williams could perform. Given the ALJ's hypothetical question, which was based on the ALJ's RFC assessment and supported by substantial medical evidence, and the vocational expert's testimony in response, the education, age, and work history factor also supports the ALJ's decision regarding Williams' physical impairments.

Williams contends that the ALJ failed to account for Williams' need to elevate his leg. However, the ALJ, as set forth above, determined that the evidence in the record did not demonstrate that Williams' needed to keep his leg elevated.

Williams also contends that the ALJ erred by relying on the Medical-Vocational Guidelines (the "Grids"). An ALJ may exclusively rely upon the Grid rules of the regulations (without the assistance of a vocational expert) to direct a conclusion of "not disabled" when the characteristics of the claimant correspond to the criteria of the pertinent rule, and the claimant

suffers either only exertional impairments or non-exertional impairments that do not significantly affect his functional capacity. *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987). Because the ALJ determined that Williams had the RFC to perform the full range of sedentary work, she was able to exclusively rely on the Grid rules to direct her conclusion. Thus, the ALJ did not err in applying the Grids to reach a finding of not disabled.

## VI.   Conclusion and Recommendation

Based on the foregoing, and the conclusion that a further development of the record is necessary because substantial evidence does not support the ALJ's finding that Williams' does not have a severe mental impairment, the Magistrate Judge

ORDERS that Defendant's Cross Motion for Summary Judgment (Document No. 14) is GRANTED, that Plaintiff's Motion for Summary Judgment (Document No. 12) is DENIED, and this decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 10th day of July, 2013.


FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

27